UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

RICARDO ROMERO, )
        Plaintiff )
)
)
v. ) Civil Action No. 10-30041-MAP
)
)
MICHAEL J. ASTRUE, )
Commissioner of Social )
Security Administration, )
        Defendant )

REPORT AND RECOMMENDATION WITH REGARD TO PLAINTIFF'S
MOTION FOR JUDGMENT ON THE PLEADINGS and DEFENDANT'S MOTION
TO AFFIRM THE DECISION OF THE COMMISSIONER (Document Nos. 8 and 10)
February 11, 2011

NEIMAN, U.S.M.J.

This is an action for judicial review of a final decision by the Commissioner of the Social Security Administration ("Commissioner") regarding an individual's entitlement to Social Security Disability Insurance ("SSDI") benefits and Supplemental Security Income ("SSI") pursuant to 42 U.S.C. §§ 405(g) and 1381(c)(3). Richardo Romero ("Plaintiff") asserts that the Commissioner's decision denying him such benefits -- memorialized in a September 17, 2009 decision of an administrative law judge -- is in error. He has filed a motion for judgment on the pleadings and the Commissioner, in turn, has moved to affirm.

The parties' motions have been referred to this court for a report and

recommendation. *See* 28 U.S.C. § 636(b)(1)(B). For the following reasons, the court will recommend that Plaintiff's motion be denied and that the Commissioner's motion to affirm be allowed.

## I. STANDARD OF REVIEW

A court may not disturb the Commissioner's decision if it is grounded in substantial evidence. *See* 42 U.S.C. §§ 405(g) and 1383(c)(3). Substantial evidence is such relevant evidence as a reasonable mind accepts as adequate to support a conclusion. *Rodriguez v. Sec'y of Health & Human Servs.*, 647 F.2d 218, 222 (1st Cir. 1981). The Supreme Court has defined substantial evidence as "more than a mere scintilla." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). Thus, even if the administrative record could support multiple conclusions, a court must uphold the Commissioner's findings "if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support his conclusion." *Ortiz v. Sec'y of Health & Human Servs.*, 955 F.2d 765, 769 (1st Cir. 1991) (citation and internal quotation marks omitted).

The resolution of conflicts in evidence and the determination of credibility are for the Commissioner, not for doctors or the courts. *Rodriguez*, 647 F.2d at 222; *Evangelista v. Sec'y of Health & Human Servs.*, 826 F.2d 136, 141 (1st Cir. 1987). A denial of benefits, however, will not be upheld if there has been an error of law in the evaluation of a particular claim. *See Manso-Pizarro v. Sec'y of Health & Human Servs.*, 76 F.3d 15, 16 (1st Cir. 1996). In the end, the court maintains the power, in appropriate circumstances, "to enter . . . a judgment affirming, modifying, or reversing the

2

[Commissioner's] decision" or to "remand [ ] the cause for a rehearing." 42 U.S.C. § 405(g).

## II. BACKGROUND

Plaintiff, born in 1962, has a ninth-grade education and worked in construction as a facility worker, certified nursing assistant, construction laborer, machine operator and salad chef. (Administrative Record ("A.R.") at 57-60, 155, 164, 166.) His applications for SSDI and SSI benefits alleged that he had been disabled due to back, neck, and shoulder pain since January 18, 2007. (A.R. at 165.) Later, at his administrative hearing, Plaintiff also claimed to be suffering from ulcers as well as insomnia, depression and anxiety. (A.R. at 10, 35.)

A. Physical Issues

The record history of Plaintiff's physical ailments is rather scant and, for the most part, predates the asserted onset date of his disability, January 18, 2007. Plaintiff injured his back in March of 2006 while working as a housekeeper at Western Massachusetts Hospital. (A.R. at 241-42.) An MRI of his lumbar spine at the time revealed mild rotary scoliosis but otherwise normal alignment, normal disc spaces, and no visible fracture or sublaxation. (A.R. at 215.) Another MRI in April showed small herniations at L4-5 and along L5-S1. (A. R. at 210.) Shortly thereafter, Plaintiff returned to work with a modified schedule. (A.R. at 229.) Plaintiff's back was again evaluated on May 26, 2006, by the Work Connection at Holyoke Medical Center; his condition was noted as "improving" and he returned to a regular work schedule. (A.R. at 209, 223-25, 230.)

3

A July 26, 2007 upper GI endoscopy showed severe esophagitis with linear ulcerations. (A.R. at 297.) Following a biopsy, Plaintiff was diagnosed by Dr. Lance Reynolds with "distal esophagus." Dr. Reynolds recommended increased proton pump inhibitor therapy and a future endoscopy. (A.R. at 297, 531.) A colonoscopy that same day was deemed normal. (A.R. at 298.)

The only other medical record with regard to Plaintiff's physical issues which postdates January 18, 2007, relates to his having been seen at Noble Hospital on January 1, 2008, for chest pains. Two electrocardiograms yielded normal results, but medication was nonetheless prescribed. Dr. Gurpal Kinjra's discharge instructions recommended that Plaintiff stop smoking, attempt to reduce his anxiety, establish adequate cardiac output, and follow up with visits to his primary care physician. (A.R. at 377-79.)

On January 17, 2008, Dr. Elaine Hom, a state agency physician, also reviewed the medical records and concluded that Plaintiff remained capable of lifting up to fifty pounds occasionally and twenty-five pounds frequently. Dr. Hom found that Plaintiff could stand sit or walk for about six hours in an eight hour work day and had no limitations on pushing and pulling. (A.R. at 495-502.) On July 14, 2008, Dr. Malin Weeratne, another state agency physician, concurred with Dr. Hom's assessment. (A.R. at 503-10.)

B. Mental Health Issues

On June 19, 2007, Plaintiff completed a personal history report and denied having symptoms of depression. (A.R. at 327-30.) As set forth below, however, he

4

received mental health treatment while incarcerated from May to October of 2008 and, thereafter, upon release.

      1. <u>Hampden County Correctional Center</u>

From May through October of 2008, Plaintiff was incarcerated at the Hampden County Correctional Center ("HCCC") and received treatment from its health services department. (A.R. at 532-570.) He sought mental health care because "the only way that the judge could release [him was] if [he] followed-up on the outside." (A.R. at 535.)

During his incarceration, Plaintiff was cooperative, oriented and attentive, his appearance was neat and clean, he had a normal rate of speech and tone, and his concentration and memory were intact. In addition, Plaintiff was consistently found by various clinicians to have a normal affect and thought process. (A.R. at 536, 540, 543, 555-57.) On June 10, 2008, however, Plaintiff's thought processes were noted by a clinician to be "tangential and disorganized" and Plaintiff reported that "he thinks he is bipolar because his friend is and he thinks he has all the symptoms." (A.R. at 555.) Even so, Plaintiff did not appear "depressed, anxious, manic, paranoid, delusional or overtly psychotic." (A.R. at 556.)

Plaintiff was thereafter referred to Forensic Mental Health Services on June 26, 2008, for an evaluation of his mental health symptoms. His symptoms were assessed as "mild" and "not totally interfering with [his] current level of functioning" and he was assigned a GAF score of 65.[1] (A.R. at 552.) On July 16, 2008, Plaintiff's affect and

---

[1] A GAF of 61-70 indicates some mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social stressors and no more than a slight impairment in social, occupational, or school functioning. *Diagnostic and Statistical*

5

mood were found to be "depressed, anxious," but his thoughts were linear, coherent and reality bound" and he denied "any symptoms of psychosis or mania." (A.R. at 545.) He was diagnosed with a mood disorder and prescribed Celexa. (*Id.*)

Plaintiff was next seen by medical personnel on July 24, 2008, at which time he had a stable mood and his thought processes were "clear, linear, and reality based." The clinician's notes at the time state that Plaintiff was "managing well," did "not complain of any issues," and did "not present with any clinical symptoms that interfere[d] with [his] level of functioning." (A.R. at 544.)

On August 20, 2008, however, Plaintiff presented as "mildly depressed" with "situational stressors," including concerns about his family and children. (A.R. at 542.) Although his thought process was tangential, he was observed to be cooperative. (*Id.*) The next day, Plaintiff complained of trouble sleeping, although a week later he said he was "doing much better on medication" and was sleeping and eating well. (A.R. at 539.) Clinical notes from September 2 and 10, 2008, similarly indicate that Plaintiff was sleeping and eating better, "denied any issues" and was feeling "somewhat less depressed and more relaxed." (A.R. at 538.)

2. Gandara Mental Health Center

Plaintiff was referred to the Gandara Mental Health Center upon his discharge from HCCC. On January 9, 2009, Plaintiff reported his major complaint as anger and anxiety and said he was taking Celexa. (A.R. at 577-86.) A May 15, 2009 assessment revealed that Plaintiff was cooperative, oriented, and motivated with a good family

---

*Manual of Mental Disorders 4th Ed.* 34 (4th Ed. 2000) (DSM-IV).

support system; he was assigned a GAF score of between 56 and 65. (A.R. at 572-73.) Plaintiff was variously diagnosed with Generalized Anxiety Disorder, Impulse Control Disorder, Mood Disorder and Intermittent Explosive Disorder. (A.R. at 557-82, 586.)

    3. Consultative Examinations

Meanwhile, on November 13, 2007, after he applied for both SSI and SSDI, Plaintiff met with Dr. Leon Hutt for a consultative mental examination. Plaintiff told Dr. Hutt that he did not use medication at the time because he did not "believe in medicines." He also stated that he helped his wife care for their children and with the daily chores. Dr. Hutt found Plaintiff to be polite, appropriate, friendly and outgoing. He also found that Plaintiff appeared only "mildly" impaired with respect to his attention, which may have been attributable to the fact that he had not slept for three days. Dr. Hutt diagnosed a nonspecified personality disorder and assigned a GAF score of 75.[2] The doctor concluded that Plaintiff "could understand, follow and remember work-related instructions and procedures and could probably psychologically tolerate stresses associated with employment." (A.R. at 348-51.)

On January 3, 2008, Dr. Daniel Dress conducted a consultative physical examination. Dr. Dress described Plaintiff, who admitted to smoking half a pack of cigarettes a day and using alcohol occasionally, as alert and in no acute distress and concluded only that he "may have limitations as to heavy lifting." (A.R. at 489-91.)

---

[2] A GAF of 71-80 indicates that if symptoms are present, they are transient and expected reactions to psychosocial stressors (e.g. difficulty concentrating after family argument); no more than slight impairment in social, occupational, or school functioning (e.g., temporarily falling behind in schoolwork). *Diagnostic and Statistical Manual of Mental Disorders 4th Ed.* 34 (4th Ed. 2000) (DSM-IV).

7

### 4. State Agency Assessments

On November 23, 2007, Dr. Brian O'Sullivan, a state agency physician, reviewed the medical records and assessed Plaintiff's mental residual functional capacity. Dr. O'Sullivan found that Plaintiff could remember simple routine directions and that, while he may have limits in acquiring verbal information, could keep pace over a full-time regular routine with familiar, simple, routine tasks. Dr. O'Sullivan also found that Plaintiff could be socially effective and seek and take direction and that, while he might need repetitions and notes to adapt to significant changes in the routine, he could otherwise adapt effectively. (A.R. at 352-55.) Dr. Peter Robbins also assessed Plaintiff's mental residual functional capacity on July 14, 2008, and reached similar conclusions. (A.R. at 511-13.)

### C. Procedural History

On August 29, 2007 and September 24, 2007, in the midst of these medical benchmarks, Plaintiff filed, respectively, applications for SSDI and SSI alleging that he had been disabled since January 18, 2007. (A.R. at 165.) Plaintiff's claim was denied initially and upon reconsideration, whereupon he was granted a hearing before an administrative law judge ("ALJ") held on August 14, 2009, where both he and a vocational expert testified. (A.R. at 5-56.) In a decision dated September 17, 2009, the ALJ found that Plaintiff was not disabled. (A.R. at 61-71.) The Decision Review Board affirmed the decision, rendering it final and subject to judicial review. (A.R. at 1-3.)

## III. DISCUSSION

An individual is entitled to SSDI benefits if, among other things, he has an

insured status and, prior to its expiration, is disabled. *See* 42 U.S.C. § 423(a)(1)(A) and (D). Entitlement to SSI, on the other hand, requires a showing of both disability and financial need. *See* 42 U.S.C. § 1381a. Plaintiff's need, for purposes of SSI, and his insured status, for purposes of SSDI, are not challenged.

A. <u>Disability Standard and the ALJ's Decision</u>

The Social Security Act (the "Act") defines disability, in part, as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). *See also* 42 U.S.C. § 1382c(a)(3)(A) (similar). An individual is considered disabled under the Act

> only if his physical and mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B). *See generally Bowen v. Yuckert*, 482 U.S. 137, 146-49 (1987).

In determining disability, the Commissioner follows the five-step protocol described by the First Circuit as follows:

> First, is the claimant currently employed? If he is, the claimant is automatically considered not disabled.
>
> Second, does the claimant have a severe impairment? A "severe impairment" means an impairment "which

9

> significantly limits the claimant's physical or mental capacity to perform basic work-related functions." If he does not have an impairment of at least this degree of severity, he is automatically not disabled.
>
> Third, does the claimant have an impairment equivalent to a specific list of impairments in the regulations' Appendix 1? If the claimant has an impairment of so serious a degree of severity, the claimant is automatically found disabled.
>
> . . . .
>
> Fourth . . . does the claimant's impairment prevent him from performing work of the sort he has done in the past? If not, he is not disabled. If so, the agency asks the fifth question.
>
> Fifth, does the claimant's impairment prevent him from performing other work of the sort found in the economy? If so he is disabled; if not he is not disabled.

*Goodermote v. Sec'y of Health & Human Servs.*, 690 F.2d 5, 6-7 (1st Cir. 1982).

In the instant case, the ALJ found as follows with respect to these questions: Plaintiff had not engaged in substantial gainful activity since the alleged onset of his disability (question 1); he has impairments which were "severe," namely, back pain, depression and anxiety but those impairments did not meet or medically equal one of the listed impairments in Appendix 1 (questions 2 and 3); and, finally, he had the residual functional capacity to do his past relevant work as a cleaner (question 4). Accordingly, without reaching question 5, the ALJ concluded that Plaintiff was not eligible for SSDI or SSI. (A.R. at 70-71.)

B.  <u>Plaintiff's Challenge to the ALJ's Decision</u>

Plaintiff makes two interrelated arguments in support of his motion for judgment on the pleadings, although other arguments appear imbedded in his supporting

10

memorandum. First, Plaintiff asserts that the ALJ's findings with regard to his residual functioning capacity are not supported by substantial evidence in the record. Second, Plaintiff asserts that the same findings were not property presented in a particular hypothetical question posed to the vocational expert, the answer to which was later adopted by the ALJ.

For his part, the Commissioner argues that substantial evidence of record supports the ALJ's determination of Plaintiff's residual functional capacity and that the ALJ correctly addressed the various factors with the vocational expert. The court, for the reasons set forth below, believes that the Commissioner has the stronger argument.

1. <u>The ALJ's Determination of Plaintiff's Residual Functional Capacity</u>

When considering whether Plaintiff could return to his past relevant work, the ALJ found that he retained the residual functional capacity to perform medium work as defined in 20 C.F.R. §§ 404.1567(c) and 416.967(c), except that he needed to be allowed to make postural changes. The ALJ found as well that, as a result of his mental impairments, Plaintiff was also limited to simple, unskilled work, which would not require him to handle more than a low level of stress or occasional changes in the work setting. The ALJ further determined that Plaintiff was restricted to a job which would allow for no more than occasional exposure to the general public in a no-production environment. Based on this analysis, the ALJ found that Plaintiff could perform his past relevant work as a cleaner and was not disabled within the meaning of the Social Security Act.

Plaintiff argues that the ALJ's assessment of his *mental* limitations is not

supported by substantial evidence.  In response, the Commissioner argues that, at most, the medical record reveals a mild mental condition which the ALJ addressed in limiting Plaintiff to simple, unskilled work in a low stress environment and no more than occasional exposure to the general public.  Plaintiff, it should be noted, does not appear to challenge the ALJ's determination with respect to his *physical* residual functional capacity.[3]

As the Commissioner argues, it is important to recognize that Plaintiff denied symptoms of depression following his alleged onset date of January 18, 2007.  (A.R. at 330.)  Moreover, Dr. Hutt, who conducted a consultative mental examination, found Plaintiff to be suffering from nothing more than a slight impairment; he found that Plaintiff could understand, follow, and remember work-related instructions and procedures and could likely tolerate stresses associated with employment.  (A.R. at 348-51.)

Plaintiff's arguments to the contrary, HCCC treatment notes also support the ALJ's conclusion that Plaintiff remained capable of simple, unskilled tasks.  As described, those notes consistently observed that Plaintiff was neat, clean, oriented and attentive, with normal speech, thought process, concentration, and memory.  They

---

[3] In any event, the Commissioner asserts that substantial evidence supports the ALJ with regard to Plaintiff's physical capabilities.  As described, both of the state agency physicians who reviewed Plaintiff's medical records found him capable of medium work.  (A.R. at 495-510.)  Their assessments, the Commissioner asserts, are consistent with the underlying medical evidence of record, which shows only "mild" rotary scoliosis, a "mild" disc bulge at L5-S1, and a "small" herniation at L4-5.  (A.R. at 231, 245.)  Moreover, Plaintiff's esophagitis was treated with antacid medication and there is no indication that he suffered any functional limitations as a result of the condition.  (A.R. at 370-409.)

also indicate that, despite Plaintiff's complaints of depression, isolation, and problems with sleeping and eating, he was not clinically depressed, anxious, or psychotic. And while Plaintiff reported a variety of issues to his clinicians, the treatment notes consistently reflect that his depression was mild and that his sleep and appetite were adequate or within normal limits and improved with medication. Further, Plaintiff's GAF scores usually ranged from 65-75, indicating that his symptoms had only a minor affect on his functioning.

The treatment notes from Gandara Mental Health also fail to document a mental condition that imposes any greater limitations than those found by the ALJ. Plaintiff is described as cooperative, motivated and oriented with a demonstrated willingness to cooperate with treatment, and GAF scores were consistent with the degree of limitations found by the ALJ.

Finally, both state agency physicians who reviewed Plaintiff's medical records concluded that he retained the ability to remember and carry out simple instructions and keep pace to perform simple, routine tasks. As these assessments are consistent with the evidence of record as a whole, they too constitute substantial evidence in support of the ALJ's decision. *See Berrio-Lopez v. Sec'y of Health & Human Servs.*, 951 F.2d 427, 431 (1st Cir. 1991); *Trembley v. Sec'y of Health & Human Servs.*, 676 F.2d 11, 13 (1st Cir. 1982).

To be sure, Plaintiff maintains that some of the treatment notes document a more severe condition. In addition, Plaintiff testified at the hearing that he had difficulty sleeping at night and being around people and suffered from anxiety, panic attacks and

paranoid thoughts. Nonetheless, as the Commissioner asserts, it is up to the ALJ to resolve any such conflicts, *see Seavey v. Barnhart*, 276 F.3d 1, 10 (1st Cir. 2001); *Tremblay*, 676 F.2d at 12, and to weigh the evidence and make credibility determinations. *See Frustraglia v. Sec'y of Health & Human Servs.*, 829 F.2d 192, 195 (1st Cir. 1987) ("The credibility determination by the ALJ, who observed the claimant, evaluated his demeanor, and considered how that testimony fit in with the rest of the evidence, is entitled to deference").

In the court's opinion, the ALJ's resolution of any conflicts in the record is supported by substantial evidence. The ALJ considered Plaintiff's activities of living, including his care for his young children and his household responsibilities of cooking, cleaning and shopping. In this regard, the court notes that Plaintiff completed a Function Report on October 3, 2007, documenting his activities of daily living, wherein he reported that he lived with his family, cared for his children, did not need medication reminders, and could take care of his personal needs, which included daily meals. He also indicated that his activities included house cleaning, laundry, repairs, ironing, and moving, and he stated that he could pay bills and handle a savings or checking account independently. Although he also stated that he did not drive or go out alone due to nervousness, he got along with authority figures, could follow written instructions "good," but spoken instructions "not to[o] good." (A.R. at 171-78.)

Finally, Plaintiff's argument that the ALJ "gave no adequate opinion for the devaluation of the opinion of the treating mental health providers" is not persuasive. First, other than painting with a broad brush, Plaintiff does not identify what treating

14

opinion the ALJ rejected without adequate explanation; if anything, the record contains relatively few treatment notes concerning Plaintiff's mental condition. Second, the ALJ considered the fact that several of Plaintiff's alleged conditions, including his bi-polar disorder, were self diagnosed. And third, the treatment notes from HCCC and the Gandara Mental Health Center, which the ALJ took into account, actually support the ALJ's determination with regard to Plaintiff's residual functional capacity. His health care providers routinely found him to be well dressed, polite, cooperative, friendly, and outgoing, and determined that his symptoms were mild and did not have any effect on his level of functioning. Accordingly, the ALJ had sufficient grounds with which to conclude that Plaintiff's subjective complaints were not fully credible based on the totality of the evidence.

2. The ALJ's Reliance on Vocation Expert's Response

As Plaintiff describes in detail, the ALJ posed eight hypothetical questions to the vocational expert. But, as the parties appear to agree, only one of those questions is relevant for present purposes, a hypothetical asking the vocational expert to consider an individual of the same age, education, and vocational background as Plaintiff, and to assume that such individual could perform medium work with the ability to lift no more than fifty pounds with postural changes, walk or sit for up to six hours a day, stand for four hours a day in a low stress environment with occasional changes in the work settings and occasional exposure to the public. The vocational expert testified that such an individual could perform Plaintiff's past work as a cleaner.

As the Commissioner argues, Plaintiff's two specific points of contention with

15

regard to the hypothetical question at issue place form over substance. First, while the ALJ used the word "maybe" in the hypothetical posed to the vocational expert, a plain reading of the hearing transcript shows that question incorporated limitations to occasional changes in the work setting and occasional exposure to the public.[4]

---

[4] Q.  Okay. . . . if he can still work than let's just move on to hypothetical number three. . . . Medium work because he testified that he could probably lift up to 50 and no more than 50, So let's say medium work with postural changes. Walking up to six hours a day. Sitting up to six hours a day. And standing up to four hours a day. If there is anything that I can characterize as a low stress job, no production. So no production, maybe occasionally changes in the work setting. And again occasional exposure to the public. Can an individual like that perform any of Mr. Romero's past relevant work?

A.  No, your Honor.

Q.  No.

A.  No.

Q.  Okay. Are there any --

A.  Medium level exertion jobs really allow the person to sit and stand as necessary.

Q.  Okay.

A.  That's usually something that would fall under the purview of either a light or sedentary job.

Q.  Okay. So even the postural limits, postural, like switching, moving around? In other words, he's testified that, you know, after a certain

| | |
|---|---|
| | period of time he kind of has to move around like this, postural. So even with that those -- |
| A. | Oh, all right. Well, I was -- I guess I was confused about what you meant by postural changes. I was assuming that he had to be able to sit and stand whenever he wanted. That's not the case. |
| Q. | No. |
| A. | Okay. |
| Q. | No. That's not what I meant. |
| A. | Okay. |
| Q. | I apologize. In other words -- |
| A. | Okay. |
| Q. | -- throughout the day he would walk, what did I say, up to six hours. |
| A. | Okay. |
| Q. | Throughout the day he would sit up to six hours. |
| A. | Okay. |
| Q. | Throughout the day he would stand up to four hours. |
| A. | Okay. |
| Q. | But during the time period that he is sitting or during the time period that he's walking, I mean sitting he has an allotment for postural changes. |
| A. | Okay. Now under those auspices then I do think that he would still be able to perform, I think he'd still be able to perform the cleaning |

17

Plaintiff's second contention is more substantive but, unfortunately for his cause, also not persuasive. In essence, Plaintiff asserts that, because the ALJ did not include a limitation to unskilled work in the hypothetical question at issue, the ALJ was precluded from relying on the vocational expert's response. As the Commissioner argues, however, the ALJ could properly rely on the expert's testimony that Plaintiff's past work as a cleaner was classified by the DOT as "unskilled, SVP 2." If Plaintiff believed his functional limitation precluded him from performing his past work, it was his burden to present evidence on that point, *Santiago v. Sec'y of Health & Human Servs.*, 944 F.2d 1, 5 (1st Cir. 1991), or at least pursue questions of the vocational expert. As the record indicates, Plaintiff's counsel chose not to ask any questions.

In the end, the sole issue for determination at step four is whether Plaintiff's residual functional capacity, as determined by the ALJ, precludes his ability to perform his past work. *See* 20 C.F.R. §§ 404.1560(a)(3), 416.960(a)(3) ("If we find that you have the residual functional capacity to do your past relevant work, we will determine that you can still do your past work and are not disabled. We will not consider your vocational factors of age, education, and work experience or whether your past relevant work exists in significant numbers in the national economy.") Here, the vocational expert testified that Plaintiff's past work as a cleaner was classified by the DOT as unskilled. Accordingly, Plaintiff's residual functional capacity did not preclude his past work as a cleaner.

---

job, Your Honor.

(A.R. 51-52.)

IV. CONCLUSION

For the reasons stated, the court recommends that Plaintiff's motion for judgment on the pleadings be DENIED and that the Commissioner's motion to affirm be ALLOWED.[5]

DATED: February 11, 2011

                                           /s/ Kenneth P. Neiman
                                           KENNETH P. NEIMAN
                                           U.S. Magistrate Judge

---

[5] The parties are advised that under the provisions of Fed. R. Civ. P. 72(b) or Fed. R. Crim. P. 59(b), any party who objects to these findings and recommendations must file a written objection with the Clerk of this Court **within fourteen (14) days** of the party's receipt of this Report and Recommendation. The written objection must specifically identify the portion of the proposed findings or recommendations to which objection is made and the basis for such objection. The parties are further advised that failure to comply with this rule shall preclude further appellate review by the Court of Appeals of the District Court order entered pursuant to this Report and Recommendation. *See Keating v. Sec'y of Health & Human Servs.*, 848 F.2d 271, 275 (1st Cir. 1988); *United States v. Valencia-Copete*, 792 F.2d 4, 6 (1st Cir. 1986); *Scott v. Schweiker*, 702 F.2d 13, 14 (1st Cir. 1983); *United States v. Vega*, 678 F.2d 376, 378-79 (1st Cir. 1982); *Park Motor Mart, Inc. v. Ford Motor Co.*, 616 F.2d 603, 604 (1st Cir. 1980). *See also Thomas v. Arn*, 474 U.S. 140, 154-55 (1985). A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.